IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LYNN R. PETERSON,

                        Plaintiff,                                    CV-09-454-ST

        v.                                                            OPINION

BRIAN SNODGRASS and DARCY
SNODGRASS,

                        Defendants.
_____

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Lynn R. Peterson ("Peterson"), originally filed this action in Clackamas County

Circuit Court on August 26, 2008, as Case No. CV 08080702.  She alleges breach of contract

and state law claims for unpaid wages and overtime against defendants, Brian and Darcy

Snodgrass, for whom she worked first as a housekeeper and later as a nanny between August

2004 and July 2008.  Notice of Removal, Ex. 3.  Peterson later amended her pleadings to include

claims for violation of the Residential Landlord and Tenant Act, ORS Chapter 90.  *Id*, Ex. 7
(First Amended Complaint).

On April 2, 2009, Peterson filed a Second Amended Complaint alleging that the failure to
pay overtime wages also violated the Fair Labor Standards Act ("FLSA"), 29 USC § 201-19.
The addition of this federal claim prompted defendants to remove the action to this court on
April 24, 2009.  *Id*, ¶¶ 2-4.

The Third Amended Complaint, filed shortly after removal to this court, alleges claims
for:  (1) breach of employment contract ("First Claim"); (2) wrongful discharge ("Second
Claim"); (3) unpaid overtime under both ORS Chapter 653 and the FLSA ("Third Claim");
(4) penalty wages (under ORS 652.150) and liquidated damages (under the FLSA, 29 USC
§ 216(b)) ("Fourth Claim"); (5) violation of ORS 659A.040 (workers' compensation
discrimination) ("Fifth Claim"); (6) violation of the Residential Landlord and Tenant Act ("Sixth
Claim"); and (7) violation of ORS 659A.112 (disability discrimination) ("Seventh Claim").
Defendants responded with a host of denials, 17 affirmative defenses, and a counterclaim for
attorney fees.  Defendants' Answer, Affirmative Defenses, and Counterclaim to Plaintiff's Third
Amended Complaint (docket #5).  As confirmed at oral argument, defendants agreed to
withdraw their Sixth (*de minimus* time), Seventh (preemption), and Fifteenth (setoff) Affirmative
Defenses.  Ford Decl., ¶ 9.

This court has subject matter jurisdiction pursuant to the FLSA, 29 USC § 216(b), and
supplemental jurisdiction over the state law claims under 28 USC § 1367.  All parties have
consented to allow a Magistrate Judge to enter final orders and judgment in this case in
accordance with FRCP 73 and 28 USC § 636(c).  Peterson filed a motion seeking summary

judgment on her First Claim (breach of employment contract), Third Claim (unpaid overtime), and Fourth Claim (penalty wages under ORS 652.150 and liquidated damages under 29 USC § 216(b)), and to strike five of defendants' remaining 14 affirmative defenses.

On December 22, 2009, this court ruled on Peterson's motion. This Opinion gives the reasoning behind that ruling.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id* at 324, citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted). A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* (citation omitted).

## UNDISPUTED FACTS

**I.    Peterson's Initial Employment with the Snodgrasses**

Peterson began working for Brian and Darcy Snodgrass in August 2004 as a

housekeeper.  Darcy Snodgrass' executive assistant, Cassie Shearer ("Shearer"), supervised her.

B. Snodgrass Depo., p. 53; Peterson Depo., pp. 19-21.  A few months later, two nannies left the

Snodgrasses'

employ at the same time, leaving them without a nanny.  Peterson Depo., pp. 38-39.  Peterson

approached the Snodgrasses about working for them as a nanny.  *Id*.

On November 29, 2004, the Snodgrasses promoted Peterson to a "Full-Time Nanny"

position, caring for their three children, then aged 14, nine, and nearly two.  Peterson Decl.,

Ex. 1.  The nanny position paid $42,000 per year based on an approximate 45-55 hour work

week.  *Id*.  When she accepted that position, Peterson acknowledged reading and understanding

"all information regarding Darcy and Brian Snodgrass' Employment Policies and Procedures."

*Id*.  Those Employment Policies and Procedures contain an "at will" provision.  Bolesky Decl.,

Ex. 1 (Employment Policies and Procedures Updated 9-11-03).

Not quite a year later, on August 6, 2005, Peterson received a performance review, at

which time she was granted two weeks of vacation per year and a $6,000 per year increase in

salary.  *Id*, Ex. 4.  As did the 2004 agreement, that performance review also incorporated the

Snodgrasses' Employment Policies and Procedures.  *Id*.

Prior to 2006, the Snodgrasses paid overtime to Peterson whenever she worked more than

50 hours in a week.  Peterson Decl., ¶ 10.  However, in April 2006, Brian Snodgrass decided that

any hours worked in excess of 50 hours per week would be paid by "comp time" (also known as

"Flex Time"), which meant that Peterson would be given time off, on an hour-for-hour basis, for each hour she worked in excess of 50 hours per week.  *Id*; Peterson Depo., pp. 111-15.

Peterson received another raise in 2006, bringing her annual salary to $55,000 per year.[1] She does not dispute that her employment at that time remained subject to the Snodgrasses' Employment Policies and Procedures.

Peterson did not live at the Snodgrasses' home, but would occasionally stay overnight to care for their children.  Peterson Decl., ¶ 4.  During the last two years of her employment, she rented a condominium in Canby ("the Canby Unit") which was owned by a company controlled by the Snodgrasses.  *Id*.

## II.  Search for Other Employment and Negotiation of the 2007 Employment Agreement

There is no evidence of dissatisfaction by the Snodgrasses with the first two years of Peterson's employment as the nanny.[2]  Nevertheless, Brian Snodgrass contends that Peterson "did not get along with other employees at all ever" and asserts that she was "a source of . . . employee gossip and everything else at the house."  B. Snodgrass Depo., p. 23.

Peterson's view of Darcy Snodgrass is equally unflattering.  Peterson describes Darcy Snodgrass as "very critical of her employees" and "not an easy person to work for."  Peterson Decl., ¶ 11.  Apparently as a result of Darcy Snodgrass' increasing criticism, by the summer of

---

[1]  Although there is no documentary evidence of the raise in 2006, Peterson testified that the $50,000 annual salary she was earning at the time she was fired in July 2008 was $5,000 less than the salary she had received over the previous year. Peterson Decl., ¶ 6.

[2]  The record contains an Employee Warning Notice (the "2006 Employee Warning Notice") which alleges a violation on September 20, 2006.  Bolesky Decl., Ex. 8.  It purports to be a first warning and alleges that other staff complain that Peterson "talks about everyone behind their backs" and is "[t]rying to turn them on each other."  *Id*.  However, the employee signature line is marked "N/A," and Peterson denies seeing that document until discovery in this case.

2007, Peterson had become increasingly anxious over "not knowing whether [she would] have a job from day to day" and began looking for other employment.  Peterson Depo., pp. 88, 104.

Late in the summer of 2007, Peterson received an offer to work as a live-in nanny with another family.  When she advised the Snodgrasses that she would be leaving their employ, they asked her to reconsider.  Peterson told them she would remain their employee if she was given a contract of employment for a two-year term.  Peterson Decl., ¶ 5.  In response, Brian Snodgrass presented Peterson with a document entitled "Employment Contract between Brian & Darcy Snodgrass and Lynn Peterson" ("2007 Contract"), which specifies that it is "in effect for 24 months from the date of signing" and further specifies:  (1) an "[a]nnual salary of $50,000 based on 50 hour work week;" (2) "work performed beyond 50 hours Comp time will accrue to be used for future days off.  Any unused comp time will be paid out at the end of the year;" and (3) rent of the Canby Unit to be $600 per month with no rent due for the month of August 2007.  *Id*, Ex. 3.  The salary specified in the 2007 Contract was $5,000 per year less than what Peterson had been paid the prior year.  Peterson was agreeable to the reduced salary because the Snodgrasses rented the Canby Unit to her at less than market rental rate.  *Id*, ¶ 6.[3]

## III.    July 3-4, 2008

In the spring of 2008, Peterson became very stressed at work, a condition she attributes to the difficulty of working with Darcy Snodgrass.  *Id*, ¶ 11.  On July 3, 2008, when Peterson reported to work, Shearer told her that Darcy Snodgrass had complained about the quality and

---

[3]  The record contains an Employee Warning Notice signed on August 18, 2007, just two days before the 2007 Contract was signed.  Bolesky Decl., Ex. 10.  It alleges a violation on August 15, 2007, purports to be a second warning, and claims that Peterson allowed the Snodgrasses' 11 year old son to watch an "R" rated movie then denied doing so to the Snodgrasses.  *Id*.  As with the 2006 Employee Warning Notice, the employee signature line is marked "N/A," and Peterson denies seeing the document until discovery in this case.

quantity of her work.  *Id*.  Peterson, who had "routinely been working 12 hours a day at this time," became visibly upset.  *Id*; Treadwell Depo., pp. 45-46.  By about 11 a.m., Peterson was crying, visibly shaken, and reported experiencing a lot of chest pain.  Treadwell Depo., p. 46.  She also became nauseous and then vomited in the bathroom.  Peterson Decl., ¶ 11.

The Snodgrasses and their employees were preparing for a party, and Haylie Hay, a woman who worked for Brian Snodgrass' business, told Peterson it was a really bad time to be gone and asked her to make it through the day.  B. Snodgrass Depo., pp. 53-54; Treadwell Depo., p. 46.  However, Peterson felt so ill that she left work and immediately went to the Geneva Health Center and Urgent Care Clinic in Wilsonville, Oregon.  Peterson Decl., ¶ 11.

At 12:30 p.m., Kelly King ("King"), a licensed physician's assistant, examined Peterson.  After ruling out a heart attack or severe hypertension, she diagnosed Peterson with anxiety and as having experienced a severe panic attack.  King Decl., ¶ 4.  King prescribed ativan (0.5 mg) and effexor (37.5 mg), which she describes as the "lowest dosages [she] can prescribe for these two medications."  *Id*.  King avers that those dosages would not interfere with Peterson's ability to safely operate a motor vehicle or make her dangerous to be around children.  *Id*, ¶ 6.  She released Peterson to return to work the following day, without any restrictions on her work duties.  *Id*, Ex. 2.

An hour or so later, Darcy Snodgrass apparently called the clinic and was told that Peterson was filing a workers' compensation claim related to her clinic visit.  Darcy Snodgrass' profanity was met by the clinic receptionist telling her that a patient has a right to use any insurance she chooses.  *Id*, Ex. 3.  Darcy Snodgrass then telephoned Peterson, angrily telling her that if Peterson "wanted to make an enemy of her, [Peterson] would," and that she would "fight

any claim" Peterson filed.  Peterson Decl., ¶ 12.  Darcy Snodgrass then hung up, but called back

a few minutes later and instructed Peterson to charge the clinic fees on a credit card in Darcy

Snodgrass' name.  *Id*.  Peterson returned to the clinic and did so.  *Id*.  Peterson filled her two

prescriptions the evening of July 3, 2008, but did not take any of the medication prescribed by

King.  *Id*, ¶ 11 & Ex. 6.

Peterson worked a ten-hour shift at the Snodgrass home the following day, July 4, 2008.

*Id*, ¶ 13.  During that shift, Darcy Snodgrass told her she was "surprised" to see Peterson at

work, and Brian Snodgrass told her to reimburse the Snodgrasses for the costs of her clinic visit.

*Id*.

## IV.    <u>Termination</u>

Peterson was off work both Saturday and Sunday, July 5-6, 2008, per her usual work

schedule.  *Id*, ¶ 14.  Sunday evening, July 6, Brian Snodgrass telephoned Peterson and told her

she was fired.[4]  *Id*; B. Snodgrass Depo., pp. 13-14.  When asked why she was being fired, Brian

Snodgrass told Peterson she lied to him and Darcy, but would not tell her the substance of the

alleged lie(s).  Peterson Decl., ¶ 14.

On July 6, the Snodgrasses completed an Employee Warning Notice which alleges a

violation on July 3, 2008.  Bolesky Decl., Ex. 11.  It purports to be a final warning and alleges

that Peterson "wanted to drive and be around kids.  [Peterson] was taking drugs while she was

---

[4] Brian Snodgrass testified that it was his decision to terminate Peterson.  Darcy Snodgrass testified that she "didn't handle any employment details of anything."  D. Snodgrass Depo., p. 36; B. Snodgrass Depo., p. 13.

around our family and friends.  We asked her if she was taking anything.  She said I have never

taking [sic] anything.  She told Merja [Treadwell][5] what she was taking."[6]  *Id*.

Brian Snodgrass adamantly believed that he and his wife were within their rights to

determine if employees caring for their children were taking drugs.  B. Snodgrass Depo., pp. 19-

21.  He asserts that Treadwell told him that Peterson confided in her that she was taking

prescription medications, which caused him to conclude that Peterson had been taking drugs on

July 3.[7]  He testified that he decided to terminate Peterson based on his belief that Peterson lied

to him by denying that she was taking any prescription medications.  B. Snodgrass Depo., pp.

15-16.  The Snodgrasses did nothing to investigate the alleged accusation of drug use other than

to confront Peterson.

On July 11, 2008, the Snodgrasses deposited a check in the amount of $3,038.30, which

purports to cover the pay period between June 23 and July 6, 2008, into Peterson's bank account.

Peterson Decl., Ex. 7.  They also sent to Peterson her final payroll check stub, along with a copy

of their "Employment Policies and Procedures 2008."  Peterson Depo., pp. 101-02, 118.

Some time thereafter, the Snodgrasses' agents notified Peterson that the monthly rent on

the Canby Unit was being increased to $1,195.00 per month.  Answer to Third Amended

Complaint, ¶ 13 (admitting Third Amended Complaint, ¶ 13).

## DISCUSSION

---

[5]  Merja Treadwell ("Treadwell") was another household employee in the Snodgrasses' home.

[6]  As do the 2006 and 2007 Employee Warning Notices, this Employee Warning Notice has "N/A" written in the employee signature line, and there is no evidence that Peterson was provided with a copy of the notices until discovery in this case.

[7]  At some point between July 3 and 4, Peterson told Treadwell she had been given a prescription by the doctor at the clinic.  Treadwell Depo., p. 52.  Treadwell denies relaying that information to the Snodgrasses and denies having any conversation with the Snodgrasses with respect to Peterson's visit to the clinic on July 3.  *Id*, p. 53.

I.      **Breach of Contract Claim (First Claim)**

The First Claim alleges that the 2007 Contract is a valid and binding employment contract for a specified time period of 24 months.  Peterson asserts that she is entitled to summary judgment on this claim because the Snodgrasses have proffered no evidence sufficient to establish a material breach by her that would justify her termination.  The Snodgrasses respond that the 2007 Contract is unenforceable and that, in any event, Peterson was terminable at will because the 2007 Contract incorporates their employment policies.  This court agrees with Peterson, strikes the Third Affirmative Defense (At-Will Employment), and grants summary judgment to Peterson on her First Claim.  However, as discussed in more detail below, a disputed issue of material fact exists over the amount of overtime worked by Peterson, preventing summary judgment as to the total amount of damages owing to Peterson on the First Claim.

A.   **Enforceability of the 2007 Contract**

Whether an enforceable contract exists is a question of law.  *Pereira v. Thompson*, 230 Or App 640, 664, 217 P2d 236, 252 (2009), citing *Dalton v. Robert Jahn Corp.*, 209 Or App 120, 131, 146 P3d 399, 406 (2006), *rev. denied*, 342 Or 416, 154 P3d 722 (2007).  The Snodgrasses assert that the 2007 Contract is unenforceable because it is missing essential terms. In particular, they assert that the 2007 Contract is missing Peterson's position of employment and a description of her job duties.  This argument lacks merit.

The 2007 Contract does not specify Peterson's job title, nor does it explicitly set forth her job duties.  However, Peterson contends that it was intended to cover her full-time nanny position, including those duties she had been performing for the preceding two and a half years since November 29, 2004.  Peterson testified that the negotiation of the 2007 Contract occurred

after she told the Snodgrasses of her intention to leave her job as their childrens' nanny, to which they responded by asking her to stay, agreeing to meet her demand of a 24-month term of employment and presenting her with the 2007 Contract.  The only conclusion that can be drawn from this series of events is that Peterson's job position, duties, and benefits remained unchanged, with the exception of the changes in term and benefits evidenced by the terms of the 2007 Contract.

The Snodgrasses rely solely on the silence of the 2007 Contract as their defense to enforceability.  At some time after December 2004 and before August 2007, Darcy Snodgrass or Shearer asked Peterson to compile a list of the duties she was expected to perform as the nanny. Peterson Depo., pp. 22-24, 33-38.  At the time she signed the 2007 Contract, Peterson understood that she would be performing the same job position of nanny with the same job duties explained in the list she had previously assisted in compiling.  *Id*, pp. 99-100.  The Snodgrasses offer no contrary evidence.

Following execution of the 2007 Contract, Peterson continued to work as a nanny for the Snodgrasses.  "'The fact that one of (the parties) with the knowledge and approval of the other, has begun performance is nearly always evidence that they regard the contract as consummated and intend to be bound thereby.'"  *Gaswint v. Case*, 265 Or 248, 254, 509 P2d 19, 22 (1973), *quoting* 1 CORBIN ON CONTRACTS 407, § 95 (1963).  Her job duties were spelled out in the job description she helped the Snodgrasses author some months previously.  There is no indication that either the Snodgrasses or Peterson intended a change in those duties following execution of the 2007 Contract, nor is there evidence that those duties in fact changed.

11 - OPINION

Based on the record, this court concludes that the 2007 Contract is not rendered unenforceable due to the failure to specify Peterson's job position and duties.

**B.  At-Will Employment**

Next, the Snodgrasses contend that the 2007 Contract, even if enforceable, is an at-will employment agreement.  In Oregon, "unless specified by agreement or statute, employment is 'at-will' and terminable by either party."  *Rushing v. SAIF Corp.*, 223 Or App 665, 669, 196 P3d 115, 117 (2008) (citations omitted).

Peterson does not dispute that her employment as a nanny initially included the terms of the Snodgrasses' "Employment Policies and Procedures," which includes an "at will" provision. Bolesky Decl., Ex. 1 (Employment Policies and Procedures Updated 9-11-03).  That initial agreement dated November 29, 2004, included a $42,000 annual salary based on a 45-55 hour work week.  *Id*, Ex. 3.  Not quite a year later, on August 6, 2005, Peterson received a performance review and was granted two weeks of vacation per year and a $6,000 per year increase in salary.  *Id*, Ex. 4.  As did the 2004 agreement, that performance review also incorporated the Snodgrasses' Employment Policies and Procedures.  *Id*.  Peterson testified that she received a raise in 2005, bringing her salary to $55,000 per year, but as discussed above, there is no document in the record reflecting that raise.  Nevertheless, Peterson does not dispute that her employment at that time incorporated the terms of the Snodgrasses' Employment Policies and Procedures.

Pointing to the language of the 2007 Contract, Peterson contends that she was not terminable at will, but instead has an enforceable contract of employment for 24 months

beginning August 20, 2007.  The Snodgrasses' responses to that argument border on the
spurious.

First, Brian Snodgrass contends that the 2007 Contract was not a "real employment
agreement," but instead was just a "makeshift" agreement designed to be in place only until the
Snodgrasses could have another agreement prepared.  B. Snodgrass Depo., p. 77.  In essence, the
Snodgrasses contend that the 2007 Contract was merely an agreement in principle, rather than a
binding and enforceable contract.  However nothing in the 2007 Contract indicates that it was so
intended.  The document states that it is an "Employment Contract" and "in effect for 24 months
from the date of signing."  Bolesky Decl., Ex. 5.  The record reveals no conduct by the parties,
either at the time of or after the execution of the 2007 Contract evidencing an intention not to be
bound by its terms.  To the contrary, the record reveals that Peterson's work duties, pay and
hours were consistent with the 2007 Contract.  Thus, this court rejects the Snodgrasses'
argument that the 2007 Contract was an unenforceable "makeshift" agreement.

The Snodgrasses also contend that Peterson always understood that her employment was
at-will based on the terms in their Employment Policies and Procedures which provides:
"Employment is not for any specified period of time and is 'at will.'  Employee may terminate
with or without notice, with or without cause, at any time.  The Snodgrass[es] may terminate any
employee, with or without notice, with or without cause, at any time."  *Id*, Ex. 1.  In support,
they cite Peterson's deposition testimony.  However, if Peterson's deposition testimony is clear
on any point, it is that she understood her employment to be at-will *only prior to the signing of
the 2007 agreement*.  Peterson Depo., pp. 20-21 (at-will employment at time of initial hire as a

housekeeper), 44-45 (at-will employment when promoted to nanny position in 2004), 96-98 (as

of time of August 20, 2007, "I wouldn't say the at-will part applied anymore").

At the time that Peterson and the Snodgrasses negotiated the 2007 Contract, they did not

discuss whether the Snodgrasses' employment policies would continue to apply.  *Id*, pp. 106-07.

However, the 2007 Contract specifies that it "is in effect for 24 months from the date of signing."

Bolesky Decl., Ex. 5.  This explicit provision effectively overrides the contrary "at-will" clause

in the Snodgrasses' Employment Policies and Procedures.  Accordingly, this court concludes

that the 2007 Contract is a binding, enforceable contract for a term of 24 months.

### C.  Just Cause for Termination

Even if they could not terminate Peterson as an "at will" employee, the Snodgrasses

contend that they had just cause to terminate her.  Peterson does not dispute that she could be

fired for a material breach of the 2007 Contract, but contends that the Snodgrasses have failed to

meet their burden of establishing that they had just cause to fire her.  Where the facts are not in

dispute and no conflicting inferences may be drawn, the court decides the issue of good cause:

> Generally, an employer can discharge an employee at will without
> incurring liability, but a contract of employment for a definite
> period continues for that period, unless there is a breach, in which
> case the person in breach cannot enforce the contract.  Where, as
> here, the facts are not in dispute and different inferences from
> those facts cannot be reasonably drawn, the court must decide as a
> matter of law whether an employer had good cause to discharge his
> employee.

*Thomas v. Bourdette*, 45 Or App 195, 199, 608 P2d 178, 180 (1980) (internal citations omitted).

The July 6, 2008 Employee Warning Notice cites a variety of reasons for Peterson's

termination, including disobedience, misconduct, substance abuse, carelessness/safety violation,

substandard work performance, attitude problems, and other.  Bolesky Decl., Ex. 11.  However,

as clarified in his testimony and in the briefing on the present motion, Brian Snodgrass' decision

to terminate Peterson rested on two alleged acts by Peterson:  (1) taking prescription medications

which presented a safety risk to the Snodgrass children because her job duties included

transporting their children in an automobile; and (2) lying to the Snodgrasses some time between

July 3 and 6, 2008, when she told them she was not taking prescription medications.  B.

Snodgrass Depo., pp. 14-15, 22-23, 26-28.

The litmus test of whether just cause existed to terminate Peterson is whether there was

substantial evidence that the Snodgrasses reasonably believed in good faith after an investigation

either that Peterson presented a safety risk to the their children or lied to them:  "When

reviewing a discharge decision of a private employer in a contract case such as this one, the court

need only find that there was substantial evidence to support the employer's decision and that the

employer believed that evidence and acted in good faith in discharging the worker." *Simpson v.*

*Western Graphics Corp.*, 53 Or App 205, 211, 631 P2d 805, 808 (1981) *aff'd*, 293 Or 96, 643

P2d 1276 (1982).  The difficulty here is the lack of any objective evidence that Peterson took any

prescription medications or lied to the Snodgrasses by telling them she had not done so.  Brian

Snodgrass' conclusions to the contrary are flatly contradicted by the only available admissible

evidence.

There is no dispute that Peterson experienced certain symptoms on the morning of July 3,

2008, including nausea, vomiting, crying, and being "visibly shaken."  Treadwell Depo., p. 46;

Peterson Decl., ¶ 11.  King examined Peterson at about 12:30 p.m. that same day.  King Aff., ¶ 2

& Ex. 1.  King's opinion is that Peterson was not taking drugs or alcohol and not "crazy" or

"dangerous to be around children." *Id*, ¶ 6. Instead, Peterson had experienced symptoms of a severe panic attack. *Id*, ¶ 4.

The Snodgrasses initiated an investigation of Peterson's absence from work shortly after she left their home that day. Within two hours of Peterson's appointment with King, Darcy Snodgrass was aware that Peterson was being treated for a panic attack related to her job. *Id*, Ex. 3; Peterson Decl., ¶ 12. Peterson admits filling the two prescriptions that King provided her shortly after 6 o'clock p.m. on July 3, 2008. Peterson Decl., ¶ 11 & Ex. 6. However, Peterson denies that she took either of those medications. *Id*, ¶ 11.

Consistent with the work release from King, Peterson returned to work a ten-hour shift the following day, July 4. At some time during that shift, the Snodgrasses contend that after learning from Treadwell that Peterson was taking prescription medications, they confronted Peterson who denied taking prescription medications.[8] The Snodgrasses then terminated her on the eve of her next scheduled work day. B. Snodgrass Depo., p. 25.

Brian Snodgrass testified that Peterson's behavior on July 3 was the source of his concern when he decided to terminate Peterson on July 6. Peterson had dilated pupils, was throwing up, and was acting "crazy" and "irrational" the morning of July 3. B. Snodgrass Depo., pp. 17, 23. The Snodgrasses contend that this evidence is sufficient to create a genuine issue of material fact that they terminated Peterson in good faith. This court disagrees. The issue is whether, despite

---

[8] This court accepts this testimony as true for the limited purpose of illuminating the Snodgrasses' state of mind, but not for proving whether Peterson, in fact, took prescription medications. As noted earlier, Treadwell denies making any such statement to the Snodgrasses. Moreover, no evidence other than Brian Snodgrass' testimony indicates that the Snodgrasses confronted Peterson with that accusation on July 4, 2008. To the contrary, the only conversation Peterson mentions between herself and the Snodgrasses on July 4, 2008, concerned Darcy Snodgrass' "surprise" that Peterson was working and Brian Snodgrass' statement that Peterson would have to reimburse them for her visit to the doctor. Furthermore, Peterson asserts that when he called her on July 6, 2008, Brian Snodgrass would not explain his statement that she had lied to him and his wife.

Peterson's denial of misconduct, the Snodgrasses' termination of Peterson was made in good faith and on the basis of substantial evidence. This court concludes that this evidence is an insufficient basis from which a factfinder could conclude that the Snodgrasses conducted any reasonable investigation into the assertions allegedly made by Treadwell.

As explained above, the 2007 Contract was not terminable at will. Thus, the Snodgrasses were on considerably different footing with regard to their obligation to investigate alleged wrongdoing than prior to the 2007 Contract. The only evidence offered by the Snodgrasses as to their investigation into Peterson's July 3 symptoms and conduct between July 3 and July 6 is that they were told by Treadwell that Peterson was taking prescription medication. However, Treadwell's alleged statement to Brian Snodgrass (one Treadwell denies making) that Peterson had taken prescription medication is not admissible to prove that Peterson had in fact done so. Nor does it constitute substantial evidence to support a good faith belief of misconduct by Peterson sufficient to justify her termination.

Brian Snodgrass did not see Peterson in possession of or taking any medications. Moreover, the record reveals no further inquiry into Peterson's ability to perform her job duties. To the contrary, Peterson worked a full ten hour shift on July 4, and there is no indication in the record that her performance that day somehow posed safety or other concerns. The medical professional who treated Peterson opined that she not taking drugs or alcohol on July 3. King Aff., ¶ 6. And the "crazy" and "irrational" behavior that Brian Snodgrass observed on July 3 all predates the documented filling of the prescription that Peterson received from King. Assuming that the Snodgrasses had such a conversation with Peterson, a single apparently unsolicited and

unverified hearsay statement of a coworker alleging misconduct is an insufficient ground to constitute just cause for terminating the 2007 Contract.

In sum, this court concludes that the 2007 Contract is enforceable for the specified 24 months and that the Snodgrasses have failed to provide evidence of a breach sufficient to justify Peterson's termination on July 6, 2008. Accordingly, this court strikes the Third Affirmative Defense (At-Will Employee) and grants summary judgment to Peterson on her First Claim. Although the base amount owed on Peterson's First Claim ($56,250.00) is not disputed, the dispute over the amount of overtime hours, as discussed below on the Third Claim, precludes summary judgment as to the amount owed for overtime on the contract claim.

## II.  Unpaid Overtime (Third Claim)

Peterson's Third Claim seeks unpaid overtime wages under both the FLSA and ORS Chapter 653. In response to Peterson's motion for summary judgment on the Third Claim, the Snodgrasses contend that the FLSA does not apply to Peterson's employment. Even if the FLSA applies, the Snodgrasses further contend that Peterson was an exempt employee under both federal and state law. In that vein, they allege in their First and Twelfth Affirmative Defenses that Peterson was either an "Exempt Employee," without providing any particular statutory reference, or an "Excluded Employee" under ORS 653.020. Barring the applicability of an exemption, the Snodgrasses assert that any overtime is payable only at 0.5 times Peterson's regular rate of pay because she worked a fluctuating workweek. Finally, even if the court finds that Peterson is entitled to overtime at 1.5 times her regular rate of pay, the Snodgrasses assert that a genuine issue of material fact concerning the number of overtime hours she worked prior

to December 24, 2007, precludes summary judgment.  This court agrees only with this final

argument.

A. **Applicability of the FLSA and Oregon Wage Laws**

As a threshold issue with regard to the Third Claim, the Snodgrasses first contend that

neither the FLSA nor Oregon's wage laws apply to Peterson's employment because she was not

"engaged in commerce" or in the "production of goods for commerce," and was not part of an

enterprise so engaged, as required under either the Individual Employee test or the Enterprise

test.  In particular, the Snodgrasses assert that the job duties Peterson performed for them were

an isolated, local activity as household staff.  This argument is not well taken.

Peterson was an employee engaged in domestic service, to which the FLSA expressly

applies.  *See* 29 USC §§ 206(f), 207(l); *see also Long Island Care at Home, Ltd. v. Coke*, 551 US

158, 162 (2007) (noting that in 1974, Congress amended the FLSA "to include many 'domestic

service' employees not previously subject to its minimum wage and maximum hour

requirements) and *Marshall v. Rose*, 616 F2d 102, 104 (4th Cir 1980) (services related to

"maintenance and security" of a private home and "admittedly domestic tasks which contribute

to the personal wants and comforts of the [employer]" brought night watchman's employment

within reach of FLSA).  The record clearly reveals that the services Peterson performed were

"services of a household nature" and, given that her employment consisted of 50-plus hours per

week, there can be no dispute that she was employed "other than on a casual basis."  *See* 29 CFR

§ 552.3 (defining the term "domestic service employment").  Accordingly, the FLSA applies to

Peterson's employment with the Snodgrasses.

Oregon law contains analogous provisions.  *See* ORS 653.020(2) (excluding domestic service employment performed on a casual basis); OAR 839-020-0004(6) (defining "casual basis" to mean "employment which is irregular and intermittent and which is not performed by an individual whose vocation is providing domestic services").  The record establishes that Peterson's vocation was providing domestic services in the Snodgrass household.  Accordingly, her employment was also covered by the provisions of ORS Chapter 653.

The Snodgrasses assert that one federal exemption and two state exemptions apply.  Specifically, they contend that Peterson was an exempt as an "administrative" employee under 29 USC § 213(a)(1)[9] and ORS 653.020(3)[10] and that, at least under Oregon law, Peterson's employment was exempt as a home child care provider under ORS 653.020(13).[11]

In the event of a conflict between the FLSA and its regulations on the one hand and ORS Chapter 653 and its regulations on the other hand, Oregon law requires employers to comply with "the standards most advantageous to the employees."  OAR 839-020-0115(3).  In particular, "when the employer may qualify for an exemption under the state law but not the federal law . . . the employer is required to comply with the federal law."  *Id*.  This mandate simplifies the inquiry in this case.  In the event Peterson was not an exempt employee under any federal statute or administrative rule, the Snodgrasses are precluded under OAR 839-020-0115 from relying on

---

[9]  29 USC § 213(a)(1) exempts "any employee employed in a bona fide executive, administrative, or professional capacity."

[10]  ORS 653.020(3) exempts an "individual engaged in administrative, executive or professional work who:
    (a) Performs predominantly intellectual, managerial or creative tasks;
    (b) Exercises discretion and independent judgment; and
    (c) Earns a salary and is paid on a salary basis."

[11]  ORS 653.020(13) exempts an individual who "performs child care services in the home of the individual or in the home of the child."

any state exemption for which there is no federal counterpart. As discussed below, this court concludes that the only federal exemption they cite, the administrative exemption of 29 USC § 213(a)(1), offers them no safe harbor.

**B. Administrative Exemption**

The Snodgrasses assert that Peterson is not entitled to summary judgment on her overtime claims and may not recover any penalties or liquidated damages under the FLSA or Oregon law because they had a reasonable basis for believing that Peterson was an exempt "administrative" employee under 29 USC § 213(a)(1) and ORS 653.020(3). These arguments are rejected.

**1. Waiver**

As a preliminary matter, Peterson asserts that the Snodgrasses have waived any right to rely on an exemption by failing to specifically identify particular exemptions in their pleadings. As explained in detail in Peterson's briefing, the Snodgrasses failed or refused to identify the exact exemptions on which they were relying until they filed their response to Peterson's summary judgment motion. However, this is not fatal to their recent efforts to be more specific. The Ninth Circuit allows defendants to raise affirmative defenses for the first time in a motion for summary judgment if the delay does not prejudice the plaintiff. *Magana v. Commonwealth of N. Mariana Islands*, 107 F3d 1436, 1446 (9th Cir 1997) (citation omitted). This court discerns no actionable prejudice to Peterson flowing from this delay. Her attorney questioned Brian Snodgrass extensively on his assertion that she was the "household manager." B. Snodgrass Depo., pp. 40-46. As explained below, the evidence offered by the Snodgrasses, including that testimony, is an insufficient basis on which to conclude that Peterson was an exempt

administrative employee.  Given the Ninth Circuit's liberal standard for eleventh-hour assertions of affirmative defenses, this court concludes that the Snodgrasses have not waived their right to assert an exemption.

## 2.  Applicability Outside a Business Context

Exemptions from the FLSA's requirements "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirt."  *Arnold v. Ben Kanowsky, Inc.*, 361 US 388, 392 (1960); *Alvarez v. IBP, Inc.*, 339 F3d 894, 905 (9th Cir 2003).

The administrative exemption on which the Snodgrasses rely, 29 USC § 213(a)(1), exempts employees employed in a "bona fide executive, administrative, or professional capacity."  Federal regulations define such an employee as one:  (1) compensated on a salary or fee basis at a rate not less than $455 per week, exclusive of board, lodging, or other facilities; (2) whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty include the exercise of discretion and independent judgment with respect to matters of significance.  29 CFR § 541.200 (emphasis added).

No straight-faced argument can be made that Peterson's employment meets all three of these requirements.  Putting aside the salary requirements, the only evidence in the record is that Peterson's primary duty was the care and safekeeping of the Snodgrasses' three children, domestic pets, and personal household belongings.  She performed a variety of cleaning, organizing, shopping, and other household tasks related to that duty, and was also charged with

transporting children and pets, and assisting in the education of the children.  Bolesky Decl., Ex. 7, p. 3.

Despite the seemingly apparent personal and household nature of the bulk of the tasks outlined in the job description for the Snodgrasses' nanny and performed by Peterson, Brian Snodgrass "didn't differentiate between [his] home and [his] business" and considered all of his employees to be "employed by a business."  B. Snodgrass Depo., p. 63.  Elaborating on that theory, the Snodgrasses argued at oral argument that the "business" in which they were engaged in employing Peterson was the "business of running a home."  They point to the formalized nature of the employment of their household staff, which included job descriptions, employment policies and practices, and employee warning notices as evidence that Peterson was employed by a business.

The Snodgrasses' formalized employment practices do give a somewhat businesslike appearance to their employment of household staff.  However, the Snodgrasses have identified no case in which the administrative exemption has been applied to workers performing services in a private family home.  Moreover, the FLSA's administrative regulations specify that the employee "must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 CFR 541.201(a).  Work "directly related to management or general business operations" includes, but is not limited to:

> . . . work in functional areas such as tax; finance; accounting;
> budgeting; auditing; insurance; quality control; purchasing;
> procurement; advertising; marketing; research; safety and health;
> personnel management; human resources; employee benefits; labor
> relations; public relations, government relations; computer

23 - OPINION

network, internet and database administration; legal and regulatory
compliance; and similar activities.

Brian Snodgrass characterized Peterson as wanting to perform every job in their

household, testifying that she "took on the duties of household manager," sometimes took on the

duties of the chef, and "if [Peterson] could have had her way, she would have been the chef, the

nanny and the housekeeper." B. Snodgrass Depo., p. 41. He described the other tasks Peterson

performed as: (1) organizing and scheduling outside vendors, such as those taking care of pest

control, appliances, house plants, and the like; (2) scheduling vet and dog washing appointments

for the dog; (3) acting as chef and completing the grocery shopping; (4) scheduling appointments

for the children and transporting the children to those appointments; (5) participating in

interviews of new housekeepers and providing input for evaluations of other employees;

(6) training other staff in the Snodgrasses' likes and dislikes; (7) taking the notes left at the house

by the Snodgrasses and assigning the work described to other employees; (8) faxing time sheets

to the Snodgrasses' accounting firm; (9) paying bills with a credit card assigned to her;

(10) watching over household items, informing the Snodgrasses if any valuables were cracked,

chipped, or broken; and (11) watching over all the staff and letting the Snodgrasses know what

was going on. *Id*, pp. 41-45.

Peterson's faxing of time records and participation in employee interviews and

evaluations may well be characterized as tasks of an "administrative" nature. However, those

tasks were not Peterson's primary job duties and were not performed in connection with the

"management or general business operations" of the Snodgrasses or their "customers." To the

contrary, every task identified by the Snodgrasses was either limited to scheduling appointments

with individuals or companies providing services for the care of the Snodgrass household,

children, or pets, or directly related to the care and safekeeping of the Snodgrass children or

household, or both.

Neither the FLSA nor its regulations explicitly state that the "running of a household"

does not qualify as a "business" which can take advantage of the administrative exemption.

However, the FLSA distinguishes between a number of different types of employment, including

employment by a "retail or service establishment," 29 USC § 207(i), in a "hospital or

establishment engaged in care of sick, aged or mentally ill," 29 USC § 207(j), by a "public

agency engaged in fire protection or law enforcement activities," 29 USC § 207(k), or (as here)

"in domestic service in one or more households," 29 USC § 207(l).  The regulations

implementing the administrative exemption do not mention employment in a "household," and

instead give examples of employment in enterprises normally engaged in the providing of goods

or services for profit.  *See* 29 CFR 541.203 (administrative exemption examples).  In short, the

"spirit" of the administrative exemption of 29 USC § 213(a)(1) is not broad enough to include

personal services performed in a private household.  The Snodgrasses were required to comply

with the FLSA's requirements and, as explained above, this likewise obligated them to comply

with the FLSA's more employee-advantageous requirements for purposes of Oregon law.

Accordingly, Peterson is entitled to summary judgment that she was not an exempt or

excluded administrative employee under 29 USC §213(a)(1) and the Snodgrasses' First and

Twelfth Affirmative Defenses are stricken.

### C.  Fluctuating Workweek

Next, the Snodgrasses contend that Peterson is entitled to payment of only 0.5 times her regular rate for any overtime hours because she worked a fluctuating workweek.  A fluctuating workweek refers to an understanding between the employer and the employee that the employee "will receive a fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many."  29 CFR § 778.114(a).  A fluctuating workweek applies when: (1) the employee's hours fluctuate from week to week; (2) the employee receives a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums); (3) the fixed amount is sufficient to provide compensation every week at a regular rate of pay that is at least equal to the minimum wage; and (4) the employer and employee share a "clear mutual understanding" that the fixed salary is intended to compensate the employee for all hours worked no matter how many or how few.  *O'Brien v. Town of Agawam*, 350 F3d 279, 288 (1st Cir 2003), citing 29 CFR § 778.114(a), (c).  The Ninth Circuit requires proof of a mutual "clear understanding" for an employer to use the fluctuating workweek method.  *Oliver v Mercy Med. Ctr., Inc.*, 695 F2d 379, 381 (9th Cir 1982) (finding insufficient evidence that the fixed salary was intended to compensate the plaintiff for all hours worked).

Even if the first three requirements are met, the record reveals no evidence of a "clear mutual understanding" between the Snodgrasses and Peterson that her $50,000 annual salary was intended to compensate her for all hours she worked, no matter how many or how few.  The 2007 Contract specifies that it is "based on a 50 hour work week."  Bolesky Decl., Ex. 5.  The record indicates that Peterson was first paid for overtime, then later given "comp time" for any hours worked over 50 per week.  Unused comp time was to be paid out in cash at the end of the year.  *Id*; Peterson Depo., p. 115.  This evidence negates the possibility that the parties had a

clear mutual understanding that the $50,000 annual salary covered all of Peterson's hours no matter how few or many hours per week she worked. Accordingly, this court rejects the Snodgrasses' arguments that Peterson is entitled to payment of overtime only at 0.5 times her regular rate of pay due to working a fluctuating work week.

**D.  Amount of Overtime Wages**

The Snodgrasses have identified no viable category of exemption covering Peterson's employment. Apart from their argument that Peterson was an exempt employee, they do not dispute that Peterson worked more than 40 hours per week – and often more than 50 hours per week – during multiple weeks, but dispute the method by which overtime should be calculated and the resulting amount of overtime owing.

An employee who seeks to recover unpaid overtime wages under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Brock v. Seto*, 790 F2d 1446, 1447-48 (9th Cir 1986), quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 US 680, 687 (1946). The burden of record-keeping is on the employer. 29 USC § 211(c). When an employer fails to keep adequate employment records, an employee may make a *prima facie* case of overtime violations if she produces "sufficient evidence to show the amount and extent of [her] work as a matter of just and reasonable inference." *Anderson*, 328 US at 687-88. Once the employee establishes a *prima facie* case, the burden then shifts back to the employer to rebut the number of hours alleged by presenting specific evidence disproving those hours. *Brock*, 790 F2d at 1448 (citation omitted). An employee is entitled to summary judgment based upon a reasonable estimate of hours worked when there is no factual dispute that the employer

failed to keep adequate records of time worked and the employer submits no other evidence

negating the reasonable inference to be drawn from the employee's evidence.

Peterson kept timesheets during her employment with the Snodgrasses and faxed those

timesheets to the accounting and payroll processing company used by the Snodgrasses.  Peterson

Aff., ¶ 7.  It appears clear that the Snodgrasses failed to keep adequate records of Peterson's

hours except as to those weeks for which they produced Peterson's timesheets, beginning the last

week of 2007.  Furthermore, Peterson avers that the hours reflected in those timesheets are a

reasonable estimate of the hours she worked during the entirety of her time with the Snodgrasses.

*Id*, ¶ 9.  The Snodgrasses have failed to submit any evidence to negate the inference that the

hours reflected in those timesheets may be used to extrapolate a reasonable estimate of the hours

worked by Peterson over the course of her employment with them.

This, however, does not fully resolve the issue of how much is owing to Peterson on

account of her overtime hours.  The parties have submitted various conflicting calculations of

overtime hours based upon Peterson's timesheets and the records of the payroll company used by

the Snodgrasses.  Multiple unexplained discrepancies exists between the various documents

submitted by the parties.  Some of the records show Peterson being paid the same amount for

working 80 hours a week as she received for working 100 hours per week.  *See* Bolesky Decl.,

Ex. 13, pp. 5-10.  Some show an hourly rate of $19.62, while others show an hourly rate of

$24.52.  The final paycheck indicates that some payment was made for regular salary, some for

holiday pay at an overtime rate, and some for compensatory time "less sick."  Peterson Aff,

Ex. 7.  However, no document itemizes the pay by categories in order to establish the various

rates of pay, leaving it unclear as to how much Peterson was paid for overtime hours in that

paycheck.  Although many of Peterson's time records indicate the accrual of "Flex Time" time, no document or testimony explains how those hours relate to the 58 hours of time reflected as being paid in her final paycheck.  Missing in the record is any testimony from a representative of the payroll processing company which might sort out these discrepancies.  This is exactly the type of dispute that is best left to development of a full factual record at trial.

In sum, disputed issues of material fact remain concerning the amount of overtime wages due to Peterson which cannot be resolved on summary judgment.  Accordingly, Peterson's request for summary judgment on the Third Claim is granted as to liability for unpaid overtime at a rate not less than 1.5 times Peterson's regular rate of pay, but denied as to the amount of damages due to a disputed issue of material fact concerning the number of overtime hours.

## II.    Penalties for Overtime Wage Violations (Fourth Claim)

### A.  Liquidated Damages Under the FLSA

Peterson seeks summary judgment on her Fourth Claim to recover liquidated damages under the FLSA in addition to penalties under state law.  An employer who violates the FLSA is ordinarily liable both for unpaid wages and an additional equal amount as liquidated damages. 29 USC § 216(b), *held unconstitutional on other grounds by Alden v. Maine*, 527 US 706 (1999). However, the court has discretion to award no or reduced liquidated damages "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]."  29 USC § 260.  In order to avoid an award of liquidated damages, or be found liable for a reduced amount, "the employer has the burden of establishing subjective and objective good faith in its violation of the FLSA.  If the employer fails to carry that burden,

liquidated damages are mandatory." *Local 246 Util. Workers Union of Am. v. S. Cal. Edison Co.*, 83 F3d 292, 298 (9th Cir 1996) (citations omitted).  To meet their burden of establishing subjective and objective good faith, the Snodgrasses must establish "an honest intention to ascertain and follow the dictates of the Act and that [they] had reasonable grounds for believing that [their] conduct complie[d] with the Act."  *Id.*

The Snodgrasses contend that liquidated damages are inappropriate because they had a reasonable basis to believe that Peterson was an exempt employee.  Apart from Brian Snodgrass' practice of treating the Snodgrasses' personal household employees identically to their business employees, the Snodgrasses have offered no further explanation of this conclusion.  Darcy Snodgrass testified to her ignorance regarding the details of personnel issues generally and, in particular, to her lack of inquiry or research regarding her obligations under the FLSA with respect to household employees.  D. Snodgrass Depo., pp. 36-38.  Brian Snodgrass did not investigate whether employees in his home were covered under the FLSA.  B. Snodgrass Depo., p. 63.  In response to Peterson's Interrogatory No. 8, asking them to identify "all steps taken by either of defendants, prior to July 3, 2008, to determine whether employees performing domestic services at Bellerive were entitled to be paid overtime for hours in excess of 40 hours in a workweek," the only substantive response was that the Snodgrasses "contend that with respect to the payment of overtime compensation for hours in excess of 40 hours in a workweek, plaintiff was an exempt employee under state and federal wage and hour law."  Ford Decl., Ex. 6.

This sort of baseless conclusion – premised upon no inquiry or investigation whatsoever – is an insufficient basis for establishing subjective and objective good faith by the Snodgrasses. The Snodgrasses have proffered no evidence that they inquired into whether: (1) they could treat

their private household staff the same as their business employees; or (2) the administrative or some other exemption might apply.  In short, irrespective of what the Snodgrasses may have subjectively assumed, there is no evidence to satisfy the objective component of the good faith requirement for purposes of avoiding an award of liquidated damages.  Accordingly, Peterson is granted summary judgment as to liability for liquidated damages.  However, because the amount of overtime is disputed and because the amount of liquidated damages is a matter within the discretion of the court, summary judgment as to the amount of liquidated damages is denied.

**B.    State Law Penalties**

Lastly, Peterson seeks penalties under both ORS 652.140 (failure to pay wages due and owing upon termination) and ORS 653.261 (failure to pay "time and a half" for overtime).

Peterson first seeks penalties for failure to pay her earned wages within one day after her termination in violation of ORS 652.140.  It is undisputed that Brian Snodgrass terminated Peterson on Sunday, July 6, and Peterson's final paycheck was deposited into her account five business days later on July 11, 2008.  This is clearly outside the statutory window for the payment of wages, entitling Peterson to summary judgment as to liability for a penalty under ORS 652.140.

Second, ORS 653.055 provides a private right of action for failure to pay overtime wages under ORS 653.261:

> (1)  Any employer who pays an employee less than the wages to which the employee is entitled under ORS 653.010 to 653.261 is liable to the employee affected:
> (a)  For the full amount of the wages, less any amount actually paid to the employee by the employer; and
> (b)  For civil penalties provided in ORS 652.150.

31 - OPINION

ORS 652.150(1) provides, in pertinent part, for the following civil penalties:

> If an employer willfully fails to pay any wages or compensation of any
> employee whose employment ceases as provided in ORS 652.140 and
> 652.145, then, as a penalty for such non-payment, the wages or
> compensation of such employee shall continue from the due date thereof
> at the same hourly rate for 8 hours per day until paid or until action
> therefore is commenced.  However, in no case shall such wages or
> compensation continue for more than 30 days from the due date.

The record reveals that Peterson worked more than 40 hours per week – and often more
than 50 hours per week – during multiple weeks of her tenure as a nanny in the Snodgrass home.
As discussed above, there is a dispute over exactly how much overtime pay remains unpaid.
However, it appears clear that some amount of overtime remains owing, even assuming that
Peterson was paid some amount for "Flex Time" (also known as "comp time") in her last
paycheck.  Thus, in accordance with ORS 652.150(1), Peterson is entitled to summary judgment
as to liability for a penalty based on the failure to pay overtime wages under ORS 653.261.
However, again the dispute over the amount of overtime wages owing precludes summary
judgment as to the amount of this penalty.

Accordingly, summary judgment is granted as to liability for two penalties for violations
of ORS 652.140 and ORS 652.261, but denied as to the amount of those penalties.

## C.  Fourteenth Affirmative Defense

Peterson also moved to strike the Snodgrasses' Fourteenth Affirmative Defense which
asserts that they are entitled to a reduction of, or offset against, their liability, if any under
ORS 652.150, to the extent of any liquidated damages awarded under 29 USC § 216(b).
However, the parties did not discuss this issue in their summary judgment briefs and, as
discussed above, the amount of any liquidated damages and penalties is a matter that must await

trial.  Accordingly, Peterson's request to strike the Fourteenth Affirmative Defense is denied as premature.

## ORDER (docket # 47)

Peterson's Motion for Partial Summary Judgment (docket # 17) is GRANTED IN PART and DENIED IN PART as follows:

First Claim (breach of employment contract): GRANTED as to liability for breach of the 2007 Employment Contract and as to the base amount owing as a result of the breach; DENIED as to the amount owing due to overtime hours;

Third Claim (unpaid overtime): GRANTED as to liability for unpaid overtime at a rate not less than 1.5 times Peterson's regular rate of pay; DENIED as to the amount of damages due to a disputed issue of material fact concerning the number of overtime hours;

Fourth Claim (penalty wages and liquidated damages):  GRANTED as to liability for two penalties for violations of ORS 652.140 and ORS 652.261 and as to the availability of liquidated damages under the FLSA; DENIED as to the amount of penalties and liquidated damages; and

Affirmative Defenses:  GRANTED as to the First (Exempt Employee), Third (At-Will Employment), Fourth (All Wages Paid), Sixth (*De Minimus* Time), Seventh (Preemption), Twelfth (Excluded Employee), and Fifteenth (Set-off) Affirmative Defenses; DENIED as to the Fourteenth Affirmative Defense (Offset or Reduction of Liability Under ORS 652.150).

DATED this 5th day of January, 2010.

s/  Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge